UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BANK ONE, N.A.,

                Plaintiff,                No. 04-CV-72118-DT

vs.                                                Hon. Gerald E. Rosen

THOMAS P. CULLEN; DIVERSIFIED
CONCEPTS AND SERVICES, INC.;
ELITE CORPORATE CONCEPTS, INC.,
d/b/a ELITE CONSTRUCTION; and
PATRICIA ORMSBY,

                Defendants.
and

THOMAS P. CULLEN,

                Counter-plaintiff.

vs.

BANK ONE, N.A.,

                Counter-defendant.
and

BANK ONE, N.A.,

                Plaintiff,

vs.

MICHAEL G. CULLEN,

                Defendant,
_____/

OPINION AND ORDER REGARDING
<u>PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT</u>

At a session of said Court, held in

the U.S. Courthouse, Detroit, Michigan
on             December 19, 2005

PRESENT:   Honorable Gerald E. Rosen
                     United States District Judge

## I. INTRODUCTION

This matter is presently before the Court on two dispositive motions filed by Plaintiff Bank One, N.A. ("Bank One")[1]: (1) Plaintiff's Motion for Partial Summary Judgment against Defendant Patricia Ormsby and (2) Plaintiff's Motion for Partial Summary Judgment on Conversion and Fraud Claims against Defendants Michael G. Cullen and Diversified Concepts and Services, Inc.[2] Defendants have responded to Bank One's Motions and Bank One has replied.

Having reviewed and considered the parties' briefs and supporting evidence, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This

---

[1] During the pendency of this action, Bank One merged with JPMorgan Chase Bank, N.A. For convenience, however, the Court will continue to refer to the Plaintiff in this action as "Bank One."

[2] Two additional dispositive motions were filed by Bank One -- a motion for summary judgment against Defendant Thomas P. Cullen and a motion to dismiss Thomas Cullen's Counterclaim. All four of Bank One's motions were scheduled to be heard together. However, on November 29, 2005, the Court was notified that Thomas Cullen had filed for bankruptcy in October 2005. Pursuant to Section 362(a) of the Bankruptcy Code, the bankruptcy filing operates as an automatic stay of all actions or claims against Thomas Cullen that arose prior to the filing. Therefore, the Court will address only the motions directed at Defendants Ormsby, Michael Cullen and Diversified Concepts and Services, Inc.

Opinion and Order sets forth the Court's ruling.

## FACTUAL BACKGROUND

This action arises out of a series of loan transactions between Plaintiff Bank One, N.A., and Defendants Elite Corporate Concepts, d/b/a Elite Construction ("ECC"),[3] Thomas Cullen and Patricia Ormsby. Thomas Cullen, his brother, Michael Cullen, and their sister, Patricia Ormsby, owned all of the stock in ECC. Michael Cullen, was the company's President, Thomas Cullen was its Chief Financial Officer, and Ms. Ormsby was the company Controller.

At the time of the transactions at issue, ECC was in the business of fabricating and installing equipment and other interior improvements in restaurants. To finance that business, Plaintiff loaned money and extended credit to ECC pursuant to a number of security agreements, promissory notes, and a line of credit agreement (collectively referred to as the "Credit Documents."). Plaintiff also extended credit to ECC by means of a credit card account (the "Credit Card Agreement"). Thomas Cullen and Patricia Ormsby guarantied repayment of ECC's indebtedness to Bank One pursuant to written guaranties.

## ECC'S INDEBTEDNESS

From 1998 through 2001, Plaintiff extended credit to ECC pursuant to the Credit Documents and the Credit Card Agreement. As of October, 2001, ECC's outstanding

---

[3] A Default was entered against ECC on August 24, 2004 for failure to answer, appear or otherwise respond.

indebtedness to Bank One was in excess of $1.1 million. However, by that time, ECC was already in default of its obligations under the Credit Documents. This default occurred because ECC breached its obligation to maintain adequate collateral pursuant to the Line of Credit Agreement between Bank One and ECC dated August 11, 2000, and its obligation to maintain adequate net worth, balance sheet leverage and cash flow coverage, as required under the Agreement.

Pursuant to the Credit Documents and by virtue of the foregoing defaults, Bank One was entitled to declare ECC's total indebtedness to be immediately due and payable; to exercise all available legal rights and remedies to collect that indebtedness from ECC and the Guarantors; and to take possession of and liquidate the Collateral in order to satisfy the indebtedness.

ECC and Patricia Ormsby acknowledged the defaults in a Forbearance Agreement entered into with Bank One on December 6, 2001. In the Forbearance Agreement, the Bank agreed to postpone taking legal action to enforce its collection rights until February 28, 2002, provided that ECC and the Guarantors fully performed the obligations required of them under the Agreement. ECC, Ormsby and Bank One subsequently entered into a series of amendments to the Forbearance Agreement pursuant to which the parties extended until June 30, 2003 Bank One's agreement not to take legal action to enforce its collection rights.

After June 30, 2003, however, because ECC and the Guarantors had failed to pay

their obligations, Plaintiff exercised its rights under the Credit Documents and the Forbearance Agreement and declared all amounts of Defendants' outstanding indebtedness to be immediately due and payable. Plaintiff also exercised its right to terminate the Credit Card Agreement, effective September 18, 2003. Upon termination of the Card Agreement and by its terms, all amounts owed to Plaintiff thereunder also became immediately due and payable.[4]

THE FORMATION OF DIVERSIFIED CONCEPTS AND SERVICES, INC. AND THE TRANSFER OF ASSETS FROM ECC

Among the Credit Documents executed by Defendants were security agreements pursuant to which ECC granted to Bank One a security interest in all of the assets of ECC, including inventory, contract rights, accounts receivable and proceeds (collectively referred to herein as "Collateral"). With respect to the accounts, Bank One was specifically granted a security interest in "accounts, chattel paper and general intangibles, letters of credit, and drafts under them, given in support of Accounts Receivable. . . ." Bank One was also granted a security interest in "all proceeds" of the Collateral, including "all cash, accounts, chattel paper and general intangibles arising from the sale,

---

[4] As of January 3, 2005, the principal amount of ECC's indebtedness to Plaintiff under the Credit Documents and the Forbearance Agreement was $841,679.35, plus interest and late charges, which continue to accrue, and the amount due and owing under the Credit Card Agreement was $97,494.20, plus interest and late charges. Also pursuant to the Credit Documents and Agreements, ECC and the Guarantors are liable to Bank One for its actual costs of collection, including reasonable attorneys' fees. As of January 1, 2005, these costs and fees amounted to $49,461.91.

rent, lease, casualty loss or other disposition of the Collateral."[5]

By September 2003, it became apparent to Bank One that Elite was not going to remain viable as a business and, therefore, the Bank began collateral recovery efforts. *See* Affidavit of Amy A. Jay, first vice-president of JPMorgan Chase Bank, ¶ 3. These efforts included analyzing ECC's accounts receivable and unfinished contracts, all of which, as indicated, were subject to Bank One's security interest. *Id.*

In October 2003, Amy Jay of Bank One had a series of meetings with ECC's president, Michael Cullen, to discuss steps with respect to the collateral ECC had pledged to Bank One in order to recover funds to pay down the defaulted loan. *Id.* ¶ 4. Michael Cullen stated to Ms. Jay that he and the other company managers had decided to shut down ECC's business. *Id.*[6] Ms. Jay asked Cullen if it would be possible for Elite to finish uncompleted work it had begun or sell those contracts to another contractor with the income and sale proceeds to be paid to Bank One. *Id.* According to Jay, in response, Cullen stated that ECC could not finish the work and that the contracts could not be sold because once ECC's major customer (YUM Brands, which owns Taco Bell, Pizza Hut, and KFC) learned that the company was going out of business it would cancel those

---

[5] Bank One perfected its security interest in the Collateral by filing appropriate financing statements with the Michigan Secretary of State.

[6] In his Affidavit, Michael Cullen states that Ms. Jay told him he had to shut down the business. *See* Michael Cullen Affidavit, ¶ 5.

contracts and let the work out for bid to other vendors, leaving nothing to sell. *Id.*[7] Ms. Jay believed that Cullen was telling the truth. *Id.* at ¶ 6. Therefore, prior to the filing of this lawsuit, Ms. Jay did not take any further actions with respect to ECC's customer contracts, such as notifying ECC's customers to pay amounts owed on those contracts to Bank One direction, or otherwise enforcing any right of Bank One to be paid on or for those contracts. *Id.*

Contrary to his representations that ECC was discontinuing its business, however, Michael Cullen kept the business going. In September 2003, he incorporated Diversified Concepts and Services, Inc. ("Diversified").[8] (Cullen never mentioned the incorporation of Diversified to Ms. Jay in any of their meetings in September/October 2003 or in any other communication. *Id.* at ¶ 5.) Diversified's operations were set up at the same building that ECC had occupied. Further, funds from ECC's bank account were transferred to Diversified and payments from ECC's customers on ECC invoices, were diverted to Diversified. *See* Plaintiff's Ex. 4, 5a, 5b, 5c.

Moreover, at the same time that Cullen represented to Ms. Jay that ECC's contracts could not be sold and no value derived from them, ECC advised Pizza Hut (part

---

[7] Cullen denies telling Ms. Jay that Bank One could not or should not attempt to sell the contracts. *See* Cullen Affidavit, ¶ 7. "I merely expressed my opinion, based on years of experience with YUM Brands, that there was a possibility that YUM may pull the contracts from Elite once it learned that Elite was going out of business. . . ." *Id.*

[8] Bank One contends that Cullen incorporated Diversified and diverted ECC's assets to that company for the purpose of sheltering the Collateral from Bank One's collection efforts.

of YUM Brands) that its "other company" (i.e., Diversified) was buying the contracts. *See* Plaintiff's Ex. 7. Further, Employees of ECC continued to secure new work from ECC's customers, but put those contracts in the name of Diversified, *see e.g.,* Plaintiff's Ex. 7a, and the customers were invoiced for the work on ECC's invoice forms with "Diversified Concepts and Services" written in over ECC's printed name as the billing vendor. *See e.g.,* Plaintiff's Ex. 5a, 5b, 5c.

Diversified's bank records evidence Diversified's misappropriation of ECC funds. By way of example, a statement from Diversified's checking account at Comerica Bank from October 2003 and copies of deposits to that account show that the source of all funds deposited to Diversified's account were either checks from ECC's bank account made payable directly to Diversified, or checks from ECC's account that were made payable to "petty cash," with the same sums then deposited to Diversified's account in the form of cash or money orders.

Bank One also maintains that Michael Cullen and Diversified misappropriated ECC's accounts receivable. As an example, Bank One points to the accounts receivable of one of ECC's customers, Zuckero and Sons. ECC's record of accounts receivable for Zuckero for October 2003 show invoices for $5,778, $789, $1,026 and $3,834. Diversified's records show that Diversified received the payments for all of these invoices and deposited them in its Comerica Bank account. *See* Plaintiff's Ex. 5a, 5b, 5c,

5e.[9]  Zuckero also provided Bank One with a copy of an October 13, 2003 internal office e-mail confirming that it had been informed at least as of that date that

> "Elite has now changed names, they are no longer Elite but now are Diversified Concepts & Services. Address and numbers are still the same, just a name change."

*See* Plaintiff's Ex. 5d.  After October 13, 2003, Zuckero was invoiced for and paid Diversified directly an additional $31,880.51.

A similar course of conduct was evidenced with respect to Meijer, Inc., another former ECC customer. Documentation produced by Meijer shows that as of October 15, 2003, Diversified had advised Meijer that ECC had changed its name to Diversified Concepts and Services Company. *See* Plaintiff's Ex. 6.  Diversified thereafter invoiced Meijer for $20,692.45.

On June 7, 2004, Plaintiff instituted this action to collect on ECC's debt asserting claims of breach of contract, promissory estoppel, conversion, fraud/misrepresentation, fraudulent transfer, and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") against Defendants Thomas Cullen, Diversified Concepts, ECC, and Patricia Ormsby.  A separate action asserting essentially the same state law and federal RICO claims was brought against Defendant Michael Cullen.  *See*

---

[9] The deposit slips for each of these deposits specifically note the Zuckero check numbers and further explicitly state that the deposited amounts reflected "Zuckero" payments.  *See* Plaintiff's Ex. 5a, 5b, 5c.

*Bank One, N.A. v. Michael G. Cullen*, No. 04-CV-74106-DT.[10] The two cases have been consolidated for all pretrial purposes.

### III. PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

Discovery has now closed[11] and Bank One has moved for summary/partial summary judgment against the various Defendants. Bank One seeks summary judgment on its breach of contract claims against Patricia Ormsby based on her guaranty of the indebtedness of ECC. Bank One also seeks partial summary judgment on its claims of conversion and fraud against Defendants Michael Cullen and Diversified Concepts.

### IV. DISCUSSION

#### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith*

---

[10] Michael Cullen filed for Chapter 7 bankruptcy prior to Bank One's filing of its Complaint against the other defendants. Accordingly, Bank One originally brought its claims against Michael Cullen as an adversary proceeding in the bankruptcy court. However, on the Plaintiff's motion, the bankruptcy reference was withdrawn so that the adversary proceeding could be consolidated with the action against all of the other defendants.

[11] The original Scheduling Order called for discovery to close on February 28, 2005. However, on the motion of Defendants Michael Cullen and Diversified Concepts, discovery was extended for an additional 60 days until April 29, 2005.

*Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[12] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

---

[12] "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

11

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply these standards in deciding Plaintiff's Motions for Summary/Partial Summary Judgment in this case.

B.  **DEFENDANT PATRICIA ORMSBY IS LIABLE FOR BREACH OF HER GUARANTY OF ECC'S INDEBTEDNESS**

Liability under a guaranty is established upon a showing that (1) the party to be held liable executed the guaranty; and (2) the obligation guaranteed has been defaulted upon. *See, e.g., F.D.I.C. v. Hershiser Signature Properties*, 777 F. Supp. 539, 540 (E.D. Mich. 1991). In this case, Patricia Ormsby admitted in her Answer to Plaintiff's Complaint that she executed the subject guaranty. *See* Ormsby Answer, ¶ 10. Further, by its express terms, the guaranty imposes liability on Ormsby for ECC's indebtedness to Plaintiff. Ormsby's guaranty provided, in pertinent part:

> To induce NBD Bank (the "Bank"). . . to make loans, extend or continue credit or some other benefit, including letters of credit and foreign exchange contracts, present or future, direct and indirect, and whether several, joint or joint and several (referred to collectively as "Liabilities"), to Elite Corporate Concepts, Inc. . . . <u>the Guarantor absolutely and unconditionally guaranties to the Bank, as primary obligor and not merely as surety, that the Liabilities will be paid when due, whether by acceleration or otherwise. The Guarantor will not only pay the Liabilities, but will also reimburse the Bank for accrued and unpaid interest, and any expenses,</u>

> including reasonable attorneys' fees, that the Bank may pay in collecting from the Borrower or the Guarantor, and for liquidating any collateral.

*See* Ormsby motion, Ex. 1

Defendant Ormsby further has admitted that ECC is in default of its obligation to Bank One.  *See* Forbearance Agreement, Ormsby motion Ex. 2.  *See also* the Affidavit of Barry J. Rourke, first vice-president of JPMorgan Chase Bank, Plaintiff's Ex. 4 at ¶ 2.

It being undisputed that ECC is in default of its financial obligations to Plaintiff, and it further being undisputed that Defendant Ormsby guaranteed the payment of those defaulted obligations, the Court finds that Plaintiff is entitled to summary judgment on its breach of contract claim against this guarantor.

C.      DIVERSIFIED CONCEPTS IS LIABLE TO PLAINTIFF FOR
        CONVERSION OF THE COLLATERAL

In Michigan, in the civil context, "conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391, 486 N.W.2d 600, 606 (1992).  In general, conversion "is viewed as an intentional tort in the sense that the converter's actions are willful, although the tort can be committed unwittingly if unaware of the plaintiff's outstanding property interest." *Id.* (citations omitted).

To support an action for conversion of money, the defendant must have an obligation to return the specific money entrusted to his care.  *Head v. Phillips Camper*

*Sales & Rental, Inc.*, 234 Mich. App. 94, 111, 593 N.W.2d 595 (1999). In this case, Bank One held a properly perfected security interest in ECC's contracts and accounts receivable, and the proceeds therefrom. M.C.L. § 440.9315 provides:

> (a) A security interest. . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest. . . .
>
> (b) A security interest attaches to any identifiable proceeds of collateral.

A creditor with a properly perfected security interest in an account has an action for conversion where the payments on those accounts are diverted elsewhere. *See e.g., Comerica Bank v. Suburban Trust and Savings Bank*, 999 F.3d 1138, 1996 WL 585888 (6th Cir. 1996). *See also*, M.C.L. § 440.9315, Comment 2. ("[A] security interest survives disposition of the collateral. In these cases, the secured party may repossess the collateral from the transferee, or in an appropriate case, maintain an action for conversion.")

In this case, it is clear that Bank One had a right to the payments on ECC's accounts at the time those payments were made. The payments having been made instead to Diversified, Bank One can recover those payments, which, according to Bank One, amount to $9,503.60, based on conversion.

D.  MICHAEL CULLEN'S LIABILITY FOR STATUTORY CONVERSION PURSUANT TO M.C.L. § 600.2919a

Plaintiff also claims that Michael Cullen should be held liable for statutory conversion because he aided in the concealment of converted property.

M.C.L. § 600.2919a provides:

A person damaged as a result of another person's buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property when the person buying, receiving or aiding in the concealment of any stolen, embezzled or converted property knew that the property was stolen, embezzled, or converted may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney's fees. This remedy shall be in addition to any other right or remedy the person may have at law or otherwise.

Bank One points to the e-mail sent by Ryan Szostek of ECC to Tom Williams of Pizza Hut, a copy of which was e-mailed to Michael Cullen, advising Pizza Hut that the "other company" was buying ECC's Pizza Hut contracts as evidence that Cullen knew of Diversified's conversion of ECC's Pizza Hut contracts. *See* Plaintiff's Ex. 7a. Plaintiff also points to Diversified's Taco Bell proposal made on September 24, 2003 by Dave Jones, who was still on ECC's payroll at the time as further evidence Cullen's imputed knowledge.

Michael Cullen claims that "issues of fact remain as to whether he or Diversified actually knew of the alleged conversion of the $9,503.60." No such issue of fact, however, has been demonstrated. Although Cullen correctly notes that he is not directly named in either of the exhibits relied upon by Plaintiff nor has Plaintiff pointed to any

15

explicit testimony that Cullen knew of the conversion of the funds, it is *Cullen's* obligation at this stage of the litigation to come forward with affirmative evidence to establish the existence of a material issue of fact. *Liberty Lobby, supra*; *Betkerur, supra*. Bare allegations and denials of liability do not suffice.

E.   BANK ONE HAS ESTABLISHED A *PRIMA FACIE* CLAIM OF FRAUDULENT TRANSFER AGAINST DIVERSIFIED

Pursuant to Michigan's Uniform Fraudulent Transfer Act, M.C.L. § 566.35,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

M.C.L. § 556.35(1). *See also, In re Hurtado*, 342 F.3d 528, 532 (6th Cir. 2003) ("[C]onveyances made by an insolvent debtor without reasonably equivalent value received in exchange are. . . considered fraudulent under § 566.35(1). . . .")

ECC's transfer of its assets to Diversified left ECC insolvent. ECC's balance sheet as of September 30, 2003 shows that as of that date, ECC had a negative net worth of over $500,000. *See* Plaintiff's Ex. 10. Defendants do not dispute this fact.[13] It is further undisputed that ECC received no consideration for the transfers of bank funds and accounts to Diversified. As such, pursuant to M.C.L. § 555.35(1), the transfers to Diversified were fraudulent. M.C.L. § 566.38 provides that a creditor may obtain

---

[13] Michael Cullen and Diversified do not address nor even mention the fraudulent transfer claim in their Response Brief.

judgment "for the value of the asset [fraudulently] transferred. . . or the amount necessary to satisfy the creditor's claim, whichever is less" against "the first transferee of the asset or the person for whose benefit the transfer was made."  Accordingly, Bank One will be awarded judgment against Diversified for the full amount of the transfers.

F.      FRAUD

Bank One also claims that Michael Cullen committed actionable fraud.  To establish a cause of action for fraud or misrepresentation under Michigan law, a plaintiff must show that (1) the defendant made a material representation, (2) the representation was false, (3) when the defendant made the representation, he knew it was false, or made it recklessly without knowledge of its truth or falsity, (4) the defendant made it with the intent that the plaintiff would act on it, (5) the plaintiff acted in reliance on it, and (6) that the plaintiff suffered injury.  *See Gage Products Co. v. Henkel Corp*, 393 F.3d 629, 645 (6th Cir. 2004) (quoting *Eerdmans v. Maki*, 226 Mich. App. 360, 573 N.W. 2d 329, 332-33 (1997)).

Bank One's fraud claim against Michael Cullen is based upon its vice-president Amy Jay's account of what Cullen allegedly said about its outstanding contracts when ECC closed its doors.  According to Ms. Jay, she asked Cullen if it would be possible for Elite to finish uncompleted work it had begun or sell those contracts to another contractor with the income and sale proceeds to be paid to Bank One.  *Id.*  According to Jay, in response, Cullen stated that ECC could not finish the work and that the contracts could

not be sold because once ECC's major customer (YUM Brands, which owns Taco Bell, Pizza Hut, and KFC) learned that the company was going out of business it would cancel those contracts and let the work out for bid to other vendors, leaving nothing to sell.  *Id.*  Believing that he was telling the truth, Ms. Jay relied upon what Cullen told her and did not take any further actions with respect to ECC's customer contracts, such as notifying ECC's customers to pay amounts owed on those contracts to Bank One direction, or otherwise enforcing any right of Bank One to be paid on or for those contracts.  *Id.* at ¶ 6.

Cullen however unequivocally denies telling Ms. Jay that Bank One could not or should not attempt to sell the contracts.  *See* Cullen Affidavit, ¶ 7.  "I merely expressed my opinion, based on years of experience with YUM Brands, that there was a possibility that YUM may pull the contracts from Elite once it learned that Elite was going out of business. . . ."  *Id.*  "A mere expression of opinion will not, although proved erroneous, be regarded as fraud."  *Graham v. Myers*, 333 Mich. 111, 114; 52 NW2d 621 (1952).  *See also Van Tassel v. McDonald Corp.*, 159 Mich. App 745, 750; 407 NW2d 6 (1987); *Webb v. First of Michigan Corp.*, 195 Mich. App 470, 474; 491 NW2d 851 (1992).  Where there is an issue of fact as to whether the defendant's statements constitute an "opinion" as opposed to material misrepresentations, summary judgment is not appropriate.  *See Little Caesar Enterprises, Inc. v. OPPCO, LLC,* 219 F.3d 547, 552 (6th Cir. 2000).

Here, there is a genuine material issue as to whether Cullen's statements to Amy

Jay constituted his opinion as opposed to material misrepresentations designed to induce the Bank to forego attempts to collect directly from ECC's customers on the outstanding contracts. Therefore, summary judgment on Plaintiff's fraud claim against Michael Cullen will be denied.

## CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary/Partial Summary Judgment on its claims of breach of contract claim against Defendant Patricia Ormsby is GRANTED as to the liability of this defendant arising out of the guaranty she executed.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment on Conversion and Fraud Claims against Defendants Michael G. Cullen and Diversified Concepts and Services, Inc. is GRANTED, in part, and DENIED, in part. Plaintiff's Motion is GRANTED with respect to Defendant Michael Cullen's and Diversified's liability on Plaintiff's claims of Conversion, Statutory Conversion and

fraudulent transfer but DENIED with respect to Plaintiff's claim of fraud.[14]

        s/Gerald E. Rosen
        Gerald E. Rosen
        United States District Judge

Dated: December 19, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 19, 2005, by electronic and/or ordinary mail.

        s/LaShawn R. Saulsberry
        Case Manager

---

[14] There is also pending Plaintiff's September 9, 2005 Motion to Compel Discovery. However, because this motion was filed more than four months after the close of discovery and was not timely filed in accordance with ¶ 2A of the Scheduling Order, this motion is DENIED.